UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

UNITED STATES OF AMERICA,

-v-

NORMAN GRAY,

Defendant.

---

21 Cr. 713 (PAE)

OPINION & ORDER

PAUL A. ENGELMAYER, District Judge:

On May 29, 2024, following a seven-day jury trial, defendant Norman Gray was found guilty of wire fraud, in violation of 18 U.S.C. § 1343, based on an approximately $1.4 million investor fraud scheme. Gray's sentencing is scheduled for November 25, 2024. Gray now moves for a new trial under Federal Rule of Criminal Procedure 33. For the reasons that follow, the Court denies the motion.

## I. Background

The Court assumes familiarity with the factual background of this case and the evidence adduced at trial. *See* Dkts. 90, 100, 152–64. The discussion that follows summarizes only the evidence necessary to resolve the instant motion.

### A. Overview of Gray's Prosecution

Superseding Indictment S1 21 Cr. 713 was filed on March 18, 2024, and charged Gray with one count of wire fraud. Dkt. 90. It alleged that, in late 2020, Gray had defrauded Andrea Pizziconi, a prospective investor, of more than $1.4 million, based on false representations about, *inter alia*, Gray's biomedical research company, Vanessa Research. *Id.* at 2–6.

The trial evidence established that Pizziconi had sent funds to Gray in three tranches. First, in early September 2020, she sent him $250,000, purportedly in exchange for a 2% equity

stake and salaried position in Vanessa Research.  Second, in late September 2020, she sent him $500,000, as an investment in a deal that Gray had falsely represented he had in place with New York University to supply it with personal protective equipment ("PPE").  Third, in October 2020, she sent Gray an additional $717,000, as an investment in a second non-existent deal to provide a university, this time, the University of Connecticut, with PPE.  Gray had secured these funds based on a range of false representations to Pizziconi, including that her money would be invested as promised; that the universities had executed purchase orders for the PPE at issue; that Gray was highly credentialed, including having a Ph.D. from the Massachusetts Institute of Technology; that Gray had significant offshore wealth; and that Gray was an investor in a mortgage company, the Tranctus Group, through which he would arrange financing for Pizziconi's purchase of an apartment during the purportedly brief period when her funds were tied up in the two purported PPE deals.

The evidence at trial of Gray's fraud on Pizziconi was overwhelming.  In addition to Pizziconi's detailed and convincing testimony, which was corroborated by her extensive email and other communications with Gray, it included:

- Numerous writings in which Gray made false representations to Pizziconi regarding the ostensible investment opportunities he was pitching in Vanessa Research and the purported PPE deals.  *See* Government Exhibit ("GX") 2006 (compendium).  For instance, in an email dated September 25, 2020, Gray represented that the purported PPE deal with New York University was a "virtually zero" risk opportunity to earn a "40% plus" return with a 90-day "cash-to-cash cycle," because he had "in hand" purchase orders for PPE amounting to $1.89 million and over $6 million.  GX 217; *see also, e.g.*, Trial Tr. at 414–18; GXs 216, 218–19.  Similarly, in a WhatsApp

message dated October 16, 2020, in connection with the second PPE deal, Gray represented to Pizziconi: "when we hit, you will have more money than you will know what do with . . . ."  GX  601; *see also* GX 229.

- Vanessa Research's financial statements, *see, e.g.*, GXs 317, 422-25, email and domain records, *see, e.g.*, GXs 901–03, and Gray's contemporaneous statements to others, *see, e.g.*, GXs 312–13, that contradicted his false representations to Pizziconi about Vanessa Research's financial condition and the PPE deals.

- Testimony of Gray's former employees with personal knowledge of the state of affairs at Vanessa Research, and of witnesses from the universities and hospitals from which Gray claimed to have purchase orders for PPE.  These established the company's porous financial condition, the difficulties it faced in reselling the substandard PPE it had acquired, and the nonexistence of the multi-million dollar PPE deals that Gray had touted to Pizziconi.  *See, e.g.*, Trial Tr. at 1032–35, 1060–62, 1074–77, 1117–19, 1128–30.

- Bank and corporate records reflecting the fate of the funds Pizziconi had transferred to Gray.  These reflected that her money had had been deposited in a bank account controlled by Gray, and that, contrary to his representations, Gray had largely used these funds to pay down credit card debt, purchase a luxury car, and purchase a new home in Cheshire, Connecticut.  *See, e.g.*, GXs 2050, 402-I, 423-P, 2014; Dkt. 137 at 3.

- Fabricated documents and a fake persona, Ben Mabry, used by Gray late in his scheme to lull Pizziconi into quiescence.  When Pizziconi hesitated to invest in the purported PPE deals, citing her need for liquidity to purchase an apartment, Gray

represented to her that he would arrange financing for the purchase through Tranctus Group, during the purportedly brief period in which her funds would be tied up in the deals. *See, e.g.*, Trial Tr. at 427–29; GXs 216, 219. He represented to her that Mabry was a loan officer at Tranctus Group. *See, e.g.*, Trial Tr. at 442; GX 601. A person holding himself out as Mabry communicated with Pizziconi over email, seemingly corroborating Gray's representations, but refused to speak with her over the phone. *See* Trial Tr. at 442–44, 448; GX 284. On October 19, 2020, Gray forwarded to Pizziconi a fake mortgage financing commitment letter from Tranctus Group. GXs 230, 232. The letter was sent to Gray from an email address supposedly belonging to Mabry (Ben@Tranctus.CO) and bore Mabry's signature. In fact, unbeknownst to Pizziconi, Gray had set up the internet domain associated with the Tranctus Group (Tranctus.CO) and the Mabry email address that same day. GXs 902, 903. And, as the letter's metadata revealed, it had been created by Gray some nine minutes before it was sent from the Mabry email address. Trial Tr. 1306–10; GX 230. Connecticut and New York state records did not support that an entity called Tranctus Group existed. GXs 1501, 1601. Further, after the promised Tranctus Group mortgage did not materialize, Gray represented to Pizziconi that he would extend her a personal loan, and sent her a fake wire transfer order supposedly showing that he had transferred funds to Pizziconi from an offshore bank account. *See, e.g.*, GXs 277, 2006. Other documents fabricated by Gray included fake purchase orders for PPE equipment by the Icahn School of Medicine at Mount Sinai and Weill Cornell Medical Center. *See, e.g.*, GXs 235, 211, 422-10, 422-94, 2103; Trial Tr. at 426–27.

Unsurprisingly in light of the overwhelming evidence of Gray's guilt, the jury's verdict was returned less than an hour after it began deliberations. Trial Tr. at 1725, 1728.

### B. Pretrial Motions Regarding the iPhone

Relevant here insofar as Gray's Rule 33 motion asserts misconduct by the Government with respect to an iPhone seized incident to Gray's arrest, there was extensive pre-trial motions practice regarding that iPhone.

On November 30, 2021, federal law enforcement officers seized the iPhone from Gray's person, at his home in Hamden, Connecticut, in the course of executing an arrest warrant signed 12 days earlier by United States Magistrate Judge Ona T. Wang. On December 7, 2021, United States Magistrate Judge James L. Cott issued a warrant authorizing the Government to search Gray's iPhone. The next day, technical personnel attached the iPhone to a proprietary forensic tool used to bypass smartphone passcodes (the "Forensic Tool"). However, after the iPhone was connected to the Forensic Tool, the technical personnel determined that, given the iPhone's operating system, the Forensic Tool's software was "not sufficiently advanced to bypass the iPhone's passcode." Dkt. 86 at 2. Accordingly, the iPhone was disconnected from the Forensic Tool and retained as potential evidence.

On March 5, 2024, Gray's counsel asked the Government to return "Mr. Gray's phone." Dkt. 99 at 2. On or about March 5, 2024, prompted to inquire by counsel's email, Special Agent John Rodriguez learned that software updates to the Forensic Tool might now enable law enforcement to bypass the iPhone's passcode. *Id.* at 10. The software update had been released on or about December 16, 2022, *i.e.*, nearly 15 months earlier. *Id.* at 2 n.2. The Government notified Gray of the software update and of its intention to obtain a new warrant for the phone. *Id.* at 2. The Government represented that it was prepared to return the phone to Gray after

imaging it if he provided the passcode, Dkt. 94 at 2, so as to enable both parties to access its contents. Gray declined. *Id.*

The iPhone was the subject of the three successive pretrial motions by Gray, as follows.

### 1. March 7, 2024 Motion

On March 7, 2024, Gray moved to "bar[]" the Government from "using" "electronic evidence" from the iPhone at trial. Dkt. 85 at 1–2. The motion characterized the phone as "Mr. Gray's phone." *Id.* Gray argued that the Government's "production and use" of data from the phone would breach Rule 16 on the ground that the Rule does not countenance "awaiting new advances in phone cracking technology." *Id.* at 2. He also argued that a "late production" by the Government of the phone's contents would be "manifestly unfair to the defense." *Id.* Gray, citing the Fourth Amendment, also stated that "there may be a meritorious suppression issue if other material is collected from the phone by the Government now"; he "reserve[d] his right to file an appropriate suppression motion" relative to "electronic evidence" collected from the iPhone. *Id.* at 1–2.

The same day, the Government filed an opposition. Dkt. 86. Relevant here, it argued that Gray's suppression motion was premature, and that Rule 16 did not require it to "turn over a source of potential evidence of wrongdoing if the Government is unable to immediately access that source of evidence." *Id.* at 5. The Government also disputed that its continuing attempts to access the phone were unfair to Gray, because the evidence at issue was in Gray's "own phone" and the Government had not been able to access the phone's contents, leaving the parties "no sense of the volume or nature of responsive material." *Id.* at 6.

On March 8, 2024, the Court ruled, in agreement with the Government, that it was premature to rule upon the admissibility at trial of the phone's contents. The Government, it

noted, had not yet obtained a new search warrant for the iPhone or gained access to its contents. Dkt. 87 at 1. The Court directed the Government, in the event such a warrant was executed and the phone accessed, to forthwith "provide the defense with an image of the phone and thereafter conduct a responsiveness review of its contents and furnish the results of that review to the defense." *Id.* at 2. At that point, the Court noted, Gray would be free to pursue any and all relief, including suppression of the fruits of the warrant based on his claim of a Fourth Amendment violation, and to raise any "burdens that the production of the iPhone's contents may impose given the timing of the warrant request and search relative to the May 20, 2024 trial date." *Id.* at 2–3. Insofar as Gray was seeking suppression of unspecified and unaccessed evidence, the Court explained, it was "premature . . . to assess whether and to what extent any such claims for relief may prove warranted." *Id.* at 3.

That same day, the Government sought, and Magistrate Judge Wang issued, a new warrant to search the iPhone. Dkt. 99 at 2.

### 2. March 28, 2024 Motion

On March 12, 2024, Gray's counsel emailed the Government regarding the phone. Dkt. 99. Gray's counsel represented, for the first time, that the defense "believe[s] that there is information on the phone both material and *helpful* to [Gray's] defense." *Id.* at 2 (emphasis added). That same day, the Government reconnected the iPhone to the Forensic Tool, which commenced efforts to access the phone. *Id.*

On March 15, 2024, the Government issued a grand jury subpoena requiring Gray to produce the passcode to the iPhone.

On March 28, 2024, Gray moved to quash the subpoena and for return of the iPhone pursuant to Federal Rule of Criminal Procedure 41(g). Dkt. 94. Gray argued that the Fifth

Amendment prohibited the Government from compelling him to provide the passcode because such would amount to requiring him " to produce evidence which later may be used against him as an accused in a criminal action." *Id*. at 9; *see* U.S. Const. amend. V.  Gray also argued that the Government's retention of the iPhone while it attempted to unlock it, for "more than 27 months," was an "unreasonable" seizure in violation of the Fourth Amendment.  Dkt. 94 at 10.  Gray distanced himself from his prior representation that he was the phone's owner.  *Compare id*. at 7, 11, *with* Dkt. 85 at 1–2.  Instead, he asserted that the Government's retention "would deny the Phone's owner—if it is, in fact, Mr. Gray—the benefit of a potential review of the contents of that Phone ahead of trial, and the use of any helpful evidence he may find."  Dkt. 94 at 11; *see also id*. at 7.

On April 5, 2024, the Government filed an opposition.  Dkt. 99.  It argued that the act-of-production doctrine under the Fifth Amendment did not protect Gray from being compelled by the grand jury to disclose the passcode because Gray "ha[d] already admitted that the device is his and that he knows the passcode."  *Id*. at 1.  Based on Gray's counsel's representation that the passcode was Gray's, the Government argued, Gray had "waived any potential act of production privilege."  *Id*. at 4.  It further argued that Gray "would need to assert that the iPhone is his" to have standing to move under Rule 41(g) as an "aggrieved party," or to "suppress the fruits of the second warrant," but that making such an assertion would defeat his Fifth Amendment claim to the extent based on the act-of-production doctrine.  *Id*. at 8.  The Government further opposed Gray's bid for relief under Rule 41(g), because he had not shown either that the seizure of the iPhone had been illegal or that the Government no longer had an evidentiary need for it.  *Id*.

On April 9, 2024, the Court quashed the subpoena seeking to compel Gray to disclose the passcode to the iPhone.  Dkt. 100 at 1 (the "April 1 Order").  The Fifth Amendment, the Court

held, barred the Government from compelling Gray to disclose the passcode, *id.* at 4, as Judge

Liman had held in analogous circumstances in *United States v. Shvartsman*, 2024 WL 1193703

(S.D.N.Y. Mar. 20, 2024). Such a compelled communication, the Court noted, required Gray "to

disclose the contents of his own mind," and "may lead to incriminating evidence," and as such

breached the Fifth Amendment, even if the passcode itself "[wa]s not inculpatory." Dkt. 100 at

3–6 (citing *Fisher v. United States*, 425 U.S. 391, 393 (1976), *Doe v. United States*, 487 U.S.

201, 211 (1988), and *United States v. Hubbell*, 530 U.S. 27, 34–35 (2000)). The Government's

attempt to treat the subpoena as governed by the act-of-production doctrine was off-base, the

Court explained, because that doctrine contemplates "compelled physical acts that implicitly

convey information," whereas the subpoena here "demand[ed] more"—as it would compel Gray

"to convey information or assert facts" from his own mind. *Id.* at 5–6.

The Court, however, denied Gray's Rule 41(g) motion. Dkt. 100 at 7. To prevail on such

a motion, "the moving party 'must demonstrate that (1) he is entitled to lawful possession of the

seized property; (2) the property is not contraband; and (3) either the seizure was illegal or the

Government's need for the property as evidence has ended.'" *United States v. Seabrook*, No. 16

Cr. 467, 2021 WL 965772, at \*2 (S.D.N.Y. Mar. 15, 2021) (quoting *Ferreira v. United States*,

354 F. Supp. 2d 406, 409 (S.D.N.Y. 2005)). The Court noted that Gray appeared, at points, to

disclaim ownership of the iPhone, which "call[ed] into question his entitlement for its return

under Rule 41 (g)." Dkt. 100 at 7 n.3. But even assuming *arguendo* that the phone was Gray's,

the Court held, Gray had not shown that the iPhone's initial seizure had been illegal or that the

Government's need for it as potential evidence had ended. *Id.* at 7. The Court found that the

initial seizure of the iPhone from Gray's person was clearly legal. *Id.* at 8. After it had validly

seized the phone, the Court explained, the Government's mission of accessing its contents "ha[d]

been hampered by the iPhone's encryption." *Id.* at 8. The Government was not responsible for that encryption and the obstacle it posed to executing the search warrant. *Id.* Having been unable to overcome the encryption, the Court found, the Government "cannot be faulted for having failed to determine whether the iPhone contains evidence relevant to Gray's case." *Id.* at 9 (finding inapposite *United States v. Metter*, 860 F. Supp. 2d 205 (E.D.N.Y. 2012)). The Court concluded that the Government had reasonably retained the iPhone "while attempting to bypass the passcode using the updated forensic tool," consistent with the Fourth Amendment. *Id.* at 8.

The Court further noted that, to the extent Gray's goal was to access the contents of the iPhone, he was at liberty to do so, by furnishing the Government the passcode. *Id.* at 9 n.6. Gray's Fifth Amendment right not to give the passcode to the Government, the Court stated, did not entitle Gray to unlock the phone for his own purposes and then lock it back up to deny access to the Government. *Id.* (citing *United States v. Young*, No. 23 Cr. 208, 2024 WL 913308, at *5 (D. Minn. Mar. 4, 2024)).

### 3. May 8, 2024 Motion

On May 8, 2024, Gray filed a renewed motion for return of the iPhone, arguing that that the Government had unreasonably retained it and that this had prejudiced him because the iPhone "potentially" contained material exculpatory evidence. Dkt. 117 at 2. Now describing the phone as "his property," *id.* at 1, Gray represented that "[h]e is generally familiar with its contents," *id.* at 4. Gray argued that he was prejudiced because the phone might contain (1) a "contact entry" for Ben Mabry, which would "refute" the Government's allegation that Mabry was a fake persona invented by Gray in furtherance of his fraud scheme; and (2) communications

"with persons involved in the effort to profit from PPE sales and resales throughout the relevant time." *Id.* at 4–5 (unredacted version).[1]

On May 10, 2024, the Government filed an opposition. Dkt. 119. It noted that the circumstances of its ongoing efforts to decrypt the iPhone "remain[ed] materially the same as when [Gray] made his prior motion over a month ago." *Id.* at 3. It argued that Gray's motion was an untimely motion for reconsideration of the April 9, 2024 order denying his earlier Rule 41(g) motion. *Id.* at 1; *see* L. Crim. R. 49.1(d) ("A motion for reconsideration . . . of a Court order determining a motion shall be filed and served within fourteen (14) days after the Court's determination of the original motion."). And, the Government noted, it was not required "turn the iPhone back over to [Gray] while the Government continues its efforts to gain access to the device pursuant to a lawfully issued search warrant." Dkt. 119 at 4. The Government termed Gray's motion "renewed," as it reflected another attempt "to gain unilateral access to the iPhone," and noted that Gray "could have obviated the need for [such motion] simply by turning over his passcode to the iPhone," hereby allowing both sides to access its contents. *See id.* at 1 (citing *Young*, 2024 WL 913308, at *4–5).

On May 13, 2024, in a bench ruling, the Court denied the motion for return of the iPhone. Dkt. 127 at 93. That motion, the Court held, although styled as a "renewed" motion, was, in substance, an untimely motion for reconsideration. *Id.* It fell well short of meeting the "high standard for reconsideration." *Id.* at 94. Even were the motion considered *de novo* and on the merits, the Court held, Gray's argument failed for multiple reasons: (1) the Government's retention of the iPhone while attempting to decrypt it was not unreasonable; (2) Gray could not

---

[1] Gray had submitted the relevant paragraph to the Court *ex parte* "so as to not prematurely divulge defense trial strategy." Dkt. 117 at 4.

claim to be denied access to the phone when he had the passcode and the Court was prepared to permit him to use the passcode to access the phone's contents, provided that he did not re-lock it after accessing it; and (3) Gray's argument that exculpatory evidence existed on the phone was "complete conjecture." *Id.* at 94–103.

Developing these points, the Court held, first, that, for the reasons it had set out in the April 1 Order, it was proper for the Government to continue to attempt to decrypt the phone. Gray had not identified material factual developments since that ruling that now made that it improper for the Government to continue to try to access the phone. And, the Court noted, until recently, Gray had not inquired about or made any demand for the phone. Nor had Gray done anything to convey that, from the defense's perspective, the phone contained relevant evidence, let alone exculpatory material. Gray's counsel had also been silent. *Id.* at 97. And, the Court noted, in March 2024, when Gray first inquired about the phone, the Government had "promptly swung into action." *Id.* Given this history and the difficulties posed by encryption, the Court found, it was "not unreasonable for the [G]overnment to continue to hold on to a smartphone as it 'continues to seek to decrypt' its contents through new technology." *Id.* (quoting *United States v. Pinto-Thomaz*, 352 F. Supp. 3d 287, 312–13 (S.D.N.Y. 2018)). The Court found unsupported Gray's claim that the Government's evidentiary need for the iPhone had "ended" when trial became imminent. *Id.* at 102. For one, it "remain[ed] possible that the forensic tool will crack the code between [the May 13 conference] and trial," scheduled to start a week later;[2] for another, the Government might use evidence recovered from the iPhone at a later proceeding.

---

[2] The Court noted the availability—without expressing an opinion on their merits—of various arguments that Gray could make to guard against any prejudice were the iPhone accessed in the days before trial and the Government to seek to offer evidence obtained from the phone.

*Id.* at 102–03 (citing *United States v. Handler*, 2023 WL 2584217, at *3 n.7 (S.D.N.Y. Mar. 21, 2023)).

Second, the Court rejected—as lacking a basis in fact or law—Gray's claim that he was being "denied access" to hypothetical exculpatory evidence. Gray, the Court noted, had the passcode to unlock the iPhone; unlike the Government, he did not need the decryption tool to access it. Moreover, the Court reiterated, it continued to stand "ready to permit Gray to use that passcode to open the iPhone so as to enable him to gain access to its contents." *Id.* at 98. The Court noted that Gray was seeking unilateral access to the iPhone, such that after gaining access, he would then be able to re-lock it, to block the Government's access. *Id.* at 98–99. No provision of law, however, gave Gray the right to "re-lock the unlocked phone" and deny the Government access to its contents while the Government had a valid warrant to search the lawfully seized phone. *Id.* at 98. The Fifth Amendment entitled Gray to block the Government's bid to exploit "his superior knowledge to unlock the phone," but Gray did not have a right to leverage his decision not to unlock the phone "into a claim that he ha[d] been denied access to exculpatory evidence." *Id.* at 99–100.

Third, Gray's "threadbare" allusions to "potentially" exculpatory evidence on the iPhone did not support his claim of prejudice. *Id.* at 100. Centrally, Gray had posited that the iPhone may contain contact information for Ben Mabry. Dkt. 117 at 4–5. As noted, during the events at issue, a person who identified himself as Mabry had held himself out over email to Pizziconi as a loan officer at Tranctus Group and proposed to help her obtain loan financing, seemingly corroborating Gray's representations to Pizziconi that he could arrange financing for her purchase of an apartment while her funds were tied up in Gray's two purported PPE deals. In fact, the Government proffered, the evidence was that Gray had personally fabricated Mabry's

identity, applied for an email address in Mabry's name, and posed as Mabry in emailing

Pizziconi, thus "hiding behind the Mabry name as part of his fraudulent scheme." Dkt. 127 at

100.  In seeking access to the phone, Gray posited that the existence of a "contact entry" for Ben

Mabry, if found on the phone, might support that Ben Mabry was a real person. Dkt. 117 at 4–

5.  The Court rejected that theory of exculpation:

> [T]he fact that Gray's phone contact might contain contact information for a person using that name, to state the obvious, does not make that person any more real as opposed to fictitious. And if Mabry is a real person whom Gray is seeking to find via use of that contact information, Gray has not proffered that he has been unable to locate or contact Mabry, or that he and his counsel have made any efforts to find the real Mabry since the indictment was returned in 2021, let alone that these efforts failed, leaving him to fall back on the 2021 contact information for Mabry on the iPhone.  On Gray's scanty showing, there is nothing preventing Gray from subpoenaing Mabry to testify at trial.

Dkt. 127 at 101.

Gray had also ventured that the iPhone "may contain unspecified text messages related to

his efforts to buy and sell PPE," but, the Court noted, he had not explained "why he cannot

access these through other methods whether through his new phone, through the Cloud, and/or

through subpoenas to service providers." *Id.*  Nor did he explain why he could not access any

emails on the iPhone by signing into the associated email account(s) on other devices to which

he and/or counsel did have access.  *Id.*  The Court accordingly denied Gray's "renewed" motion

for return of the iPhone, while reiterating that Gray was at liberty to gain access to the phone by

providing its password.

### C.  Gray's Post-Trial Offer to Produce the Passcode

Trial began May 20, 2024 and ended on May 29, 2024, with the jury's return of the guilty

verdict. Dkt. 139.  As of trial, the Government had not accessed the phone, and Gray had chosen

not to access it.  As a result, no evidence extracted from the iPhone was presented at trial.

14

After trial, Gray, for the first time, made an offer to the Government of terms under which he would provide the password to the phone. Dkt. 150 at 1; *see also* Dkt. 127 at 98–99. On or about June 12, 2024, while that offer was pending, the Forensic Tool unlocked the phone. Dkt. 150 at 1. Upon accessing the phone, the Government produced its contents to Gray. *Id.*; Dkt. 168-1 at 3.

### D.    Gray's Rule 33 Motion

On July 26, 2024, Gray moved for a new trial pursuant to Federal Rule of Criminal Procedure 33. His motion claimed pretrial misconduct by the Government with respect to the iPhone and that he was prejudiced by the Government's retention of the iPhone while it attempted to decrypt it. Dkt. 168 ("Gray Br."). On August 23, 2024, the Government filed an opposition. Dkt. 178 ("Gov't Br."). The Government appended to its brief the ostensibly "newly discovered evidence" from which Gray had cited snippets and/or paraphrased. *See id.* at 7–20. On September 6, 2024, Gray filed a reply. Dkt. 183 ("Gray Reply Br.").

## II.    Discussion

Gray seeks a new trial under Rule 33 on a single ground: that his defense at trial was ostensibly prejudiced by governmental misconduct with respect to the iPhone seized incident to Gray's arrest. In its three pretrial rulings, the Court has rejected Gray's premise: that the Government's retention of the phone was unreasonable so as to afford Gray the relief he then sought (either return of the phone and/or preclusion of use by the Government at trial of any of its contents). And as the Court repeatedly emphasized, Gray at all times was at liberty to obtain full access to the phone's contents by unlocking it or providing the Government with the passcode to do so. His bid to gain unilateral access to the phone, however, lacked a basis in law. Gray's post-trial motion under Rule 33 does not make any new argument towards this end. And,

with the phone's contents now accessed, it has become clear that its contents would not have assisted Gray at all at trial. Gray thus fails to establish any error, let alone prejudicial error, with respect to the Government's conduct with respect to the iPhone.

## A. Legal Standards Governing Rule 33 Motions

Under Rule 33, a "court may vacate any judgment and grant a new trial if the interest of justice so requires." Fed. R. Crim. P. 33(a). The Rule "confers broad discretion upon a trial court to set aside a jury verdict and order a new trial to avert a perceived miscarriage of justice." *United States v. Sanchez*, 969 F.2d 1409, 1413 (2d Cir. 1992). Motions for a new trial, however, "are disfavored in this Circuit." *United States v. Gambino*, 59 F.3d 353, 364 (2d Cir. 1995). In exercising its discretion, the court must be careful not to wholly usurp the role of the jury, and should defer to the jury's assessment of witnesses and resolution of conflicting evidence unless "exceptional circumstances can be demonstrated." *Sanchez*, 969 F.2d at 1414. Ultimately, the court must decide "whether letting a guilty verdict stand would be a manifest injustice." *United States v. Ferguson*, 246 F.3d 129, 134 (2d Cir. 2001). The court should "examine the entire case, take into account all facts and circumstances, and make an objective evaluation." *Id.* After doing so, "[t]here must be a real concern that an innocent person may have been convicted" in order to grant the motion. *Sanchez*, 969 F.2d at 1414. The court's Rule 33 authority should be used "sparingly" and only "in the most extraordinary circumstances." *Ferguson*, 246 F.3d at 134 (citation omitted).

Where based on newly discovered evidence, a Rule 33 motion must be filed within three years of the verdict. Fed. R. Crim. P. 33(b)(1). Where based on any other grounds, the motion must be filed within 14 days of the verdict. Fed. R. Crim. P. 33(b)(2).

## B. Application

Gray —who now concedes that the iPhone was his, *see* Gray Br. at 9, 10—contends that the iPhone "contains both exculpatory evidence and impeachment material" and that he was prejudiced by the Government's "failure to provide Mr. Gray with [its] contents . . . before trial concluded." *Id.* at 10, 12 (capitalization altered). Gray concedes that "the facts here do not outline a classic, conventional claim under *Brady v. Maryland*, 373 U.S. 83 (1963)," but argues that his claim is "sufficiently *Brady*-adjacent" for the Court to find prejudicial misconduct by the Government in connection with the iPhone. *Id.* at 3, 13. Gray's argument is easily put aside.

The Court first addresses Gray's claim of misconduct and then his theory of prejudice.

### 1. Gray's Claim of a "*Brady*-Adjacent" Violation

Generously reading his motion, Gray articulates what appear to be two distinct theories of governmental misconduct leading to his not being furnished the contents of the phone before or during trial. Gray Br. at 10. First, he faults the Government for "its delay in using the upgraded forensic tool." *Id.* at 3. Second, he faults the Government for thereafter not unconditionally returning the phone to Gray, notwithstanding its holding a valid warrant to search the phone's contents. *Id.* at 1, 3, 12 n.2. For the reasons the Court has previously set out at length, neither theory of Gray's establishes unreasonable conduct by the Government, let alone a due process violation based on *Brady. See* Dkts. 100, 122.

As to the first theory, the Government's efforts to access the contents of the iPhone after lawfully seizing it were hamstrung by the phone's encryption, a complication for which Gray, not the Government, was responsible. Initially, the Government lacked a forensic tool capable of overcoming the encryption. The Government thereafter did not alert to the development of such tool. But it did so, and it began the time-intensive process of using the tool to attempt to gain access to the phone, promptly once Gray inquired about the phone. And there is no evidence that

17

the Government deliberately delayed in learning of the development of a new forensic tool to unlock the phone. On the contrary, the Government had a powerful investigative interest in gaining access to the phone's contents. *See* Dkt. 100 at 7–10; *Pinto-Thomaz*, 352 F. Supp. 3d at 312–13; *Allen v. Grist Mill Cap. LLC*, 88 F.4th 383, 396 (2d Cir. 2023) ("[D]uring the pendency of an ongoing criminal investigation or proceeding, the defendant bears the burden of demonstrating that the government's retention of the seized property is unreasonable."); *cf., e.g.*, *United States v. Jarman*, 847 F.3d 259, 266 (5th Cir. 2017) ("Courts have . . . consistently 'permitted some delay in the execution of search warrants involving computers because of the complexity of the search . . . .'" (quoting *United States v. Syphers*, 426 F.3d 461, 469 (1st Cir. 2005))). The Government also sought to access the phone via by a subpoena to Gray for the phone's password. Although the Court quashed that subpoena on Fifth Amendment grounds, *see* Dkt. 100 at 6, the Government's multiple efforts to access the phone are inconsistent with Gray's suggestion that it deliberately slow-walked the process of pursuing access to the phone's contents. Gray has not identified any other step the Government should have taken, but did not take, to access the phone.

As to Gray's second theory, Gray has not articulated, and the Court has not found, any legal authority (whether in the Constitution or in the Federal Rules of Criminal Procedure) under which Gray was entitled to obtain *unilateral* access to the iPhone's contents while the phone remained subject to an undisputedly valid search warrant. The Government made clear to Gray that he had the ability to gain access to the contents of the phone, either by furnishing the Government with the phone's passcode or by unlocking the phone, after which point each side would have access to its contents. Gray did not take the Government up on this invitation, demanding instead that the phone be returned to him permanently (or temporarily with the right

to re-lock the phone after accessing it). But as the Court held, there was no legal authority under which Gray was entitled to unlock the phone, access its contents, and then re-lock the phone so as to bar the Government from accessing the phone pursuant to its extant search warrant. Dkt. 127 at 99–101; *see also Hoffa v. United States*, 385 U.S. 293, 303–04 (1966). And as the Court noted, Gray's Fifth Amendment right not to be compelled to communicate the phone's passcode to the Government, based on which the Court had quashed the testimonial subpoena to Gray, did not give Gray the right to take the physical, non-communicative act of re-locking the phone after unlocking it. Dkt. 127 at 99–101

In these circumstances, the due process right recognized in *Brady* of a defendant to the production of exculpatory evidence does not have any bearing here, Gray's novel claim to have had a "sufficiently *Brady*-adjacent" right to the unconditional production of the phone to him notwithstanding. *See* Gray Br. at 13; *see also* Gray Reply Br. at 2. Simply put, the contents of Gray's phone, while encrypted as they were through the end of trial, were not within the Government's possession, custody, or control for purposes of *Brady* and its progeny, *Giglio v. United States*, 405 U.S. 150, 154 (1972), the latter applicable to material tending to impeach adverse witnesses. *See Young*, 2024 WL 913308, at *4–5; *United States v. Case*, No. 19 Cr. 360 (BLW), 2020 WL 4227554, at *3–4 (D. Idaho July 23, 2020). The Government cannot copy the contents of a phone to which it lacks access. *See United States v. Djibo*, 730 F. App'x 52, 56 (2d Cir. 2018) ("To establish a *Brady* or *Giglio* violation, 'a defendant must show that: (1) the government, either willfully or inadvertently, suppressed evidence; (2) the evidence at issue is favorable to the defendant; and (3) the failure to disclose this evidence resulted in prejudice.'" (quoting *United States v. Coppa*, 267 F.3d 132, 140 (2d Cir. 2001))); *cf., e.g., United States v. Bibby*, 752 F.2d 1116, 1125 (6th Cir. 1985) ("The purpose of *Brady* and its progeny is not to

require the prosecutor to search out exculpatory evidence but rather to divulge whatever exculpatory evidence he already has."); *United States v. Kraemer*, 810 F.2d 173, 178 (8th Cir. 1987) (under *Brady*, "[t]he government is not required to search out exculpatory evidence for the defendant"). And Gray has not identified any authority supporting his claim that the Government, while possessing a valid search warrant for the phone, was obliged to relinquish the phone to Gray so as to enable him unilaterally to access its contents and then re-lock it.

### 2.    Gray's Claim of Prejudice

Gray, tellingly, has abandoned his pretrial claim about why his lack of access to the iPhone's contents stood to prejudice him at trial. He had argued that the iPhone contained contact information for Ben Mabry—the purported loan officer whom Gray had posed as to lull the defrauded Pizziconi into inaction—and that this supported that Mabry was a real person. *See* Dkt. 117 at 4–5 (unredacted). As noted, the Court rejected that theory, *see* Dkt. 127 at 100–01, and the trial evidence overwhelmingly showed Mabry to have been a fictitious loan officer invented by Gray for the purpose of deluding Pizziconi, *see, e.g.*, Trial Tr. 1306–10, 1562–63; GXs 230, 902, 903, 1501. And the iPhone, when accessed after trial, did not contain any information to support Gray's claim that Mabry was real, or even the contact entry for Mabry that Gray had argued might be present. *See* Gov't Br. at 3.

In support of his claim of prejudice, Gray instead now points to four "nuggets" of information found on the iPhone, each of which he characterizes as "newly discovered" within the meaning of Rule 33. Gray Br. at 6–7; *see* Fed. R. Crim. P. 33(b) (Rule 33 motion must be filed within 14 days after the verdict or finding of guilty unless "grounded on newly discovered evidence"). For these to support Gray's bid for Rule 33 relief, he bears to the burden to show: (1) "that the evidence is 'newly discovered after trial'; (2) that 'facts are alleged from which the court can infer due diligence on the part of the movant to obtain the evidence'; (3) that 'the

evidence is material'; (4) that the evidence 'is not merely cumulative or impeaching'; and (5)

that 'the evidence would likely result in an acquittal.'" *United States v. James*, 712 F.3d 79, 107

(2d Cir. 2013) (quoting *United States v. Owen*, 500 F.3d 83, 88 (2d Cir. 2007))).  Gray does not

come close to making this showing as to any of the four "nuggets."

### 3. October 6, 2020 Text Message

Gray first cites an October 6, 2020 text message from Vanessa Research's then-CFO Don

Janezic to Gray, in which Janezic describes Pizziconi's proposal for valuing Vanessa Research

shares in connection with Pizziconi's notional investment in Gray's company.  Janezic writes,

"Latest is that [Pizziconi] wants a very low valuation so that she buys more shares and she wants

an early plan to pay dividends to shareholders. We have to be very careful with self-dealing."

Gray responds: "Good evening . . . Thanks." Gov't Br., Ex. 1 at 2.  Gray argues that Janezic's

message shows that he did not intend to defraud Pizziconi, as it shows that he was "aware[]" that

"the amount" and "valuation of shares" sought by Pizziconi "w[ere] set."  Gray Br. at 6.

Gray's contention fails for multiple reasons.  For one, the text message is cumulative of

another communication in Gray's possession before trial. *See, e.g., James*, 712 F.3d 79 at 107

("To merit relief based on a claim of newly discovered evidence, the burden is on the defendant

to [show]. . . that the evidence is not merely cumulative or impeaching"); *United States v. Jereis*,

597 F. App'x 653, 655 (2d Cir. 2015) (same).  At a pretrial conference, Gray had discussed a

document marked DX-G, a text from Janezic to Pizziconi, dated October 22, 2020, which

Pizziconi forwarded to Gray, in which Janezic raised the same self-dealing concern in relation to

Pizziconi's share valuation proposal.  The defense forewent offering DX-G. *See* Dkt. 129 at 57–

59 (Tr. of May 17, 2024 conference); Gov't Br. at 4.  Gray does not argue that the October 6,

2020 text message is other than cumulative of DX-G.

More substantively, Gray's construction of the text message as exculpatory is wrong. Nothing about Janezic's opinion as to the appropriate valuation of Pizziconi's shares has any bearing on Gray's mental state in making his varied false representations to Pizziconi to procure her money, or the falsity of those representations. The October 6, 2020 text message is wholly unrelated to Gray's representations to Pizziconi regarding the purported PPE orders, based on which Pizziconi sent Gray more than $1.2 million. It pertains, at most, to Gray's representations regarding the purported Vanessa Research investment opportunity. And as to that, the October 6, 2020 text message does nothing to contradict the items in evidence that showed the falsity of these representations.

### 4. October 28, 2020 text messages to Highsmith and Janezic

Gray argues that text messages from late October 2020 show that he made attempts to assist Pizziconi in financing the purchase of an apartment while her funds were tied up in the fake PPE deals. Gray Br. at 6. The first is an October 28, 2020 text message thread in which Gray solicits Carlton Highsmith's help in arranging financing for Pizziconi, portraying her as "coming apart." Gov't Br., Ex. 2. In a separate text message thread that day, Gray discusses with Janezic an arrangement by which Janezic would buy the apartment and have Pizziconi purchase it back from him over time. Gray contends that these communications reflect his desire to "aid" Pizziconi and therefore "counter[] the Government's fraud narrative." Gray Br. at 6.

Gray's bid for Rule 33 relief based on these messages also fails for multiple reasons. For one, Gray in no sense was denied access to the text message thread involving Highsmith. As the Government recounts, it produced this communication to Gray in February 2024, long before trial, having obtained it from Highsmith via a subpoena. Gov't Br at 5. This evidence cannot be termed "newly discovered."

For another, Gray's communications to Highsmith and Janezic do not undermine the evidence of Gray's fraudulent acts and intent. They do not bear on the falsity of the statements by which Gray obtained Pizziconi's money, including regarding her equity stake in Vanessa Research or the supposedly risk-free returns from PPE deals as to which Gray falsely claimed he had purchase orders "in hand." The reason Pizziconi required financing for her purchase of the apartment was because she had sent her funds to Gray based on these false representations. That the means that Gray contemplated using to lull Pizziconi into quiescence and from discovering the fraud he had perpetrated on her included one in which an underling of his would have bought the apartment on which Pizziconi was set to close did not, in any way, refute the existence of the fraud.

### 5.  Communications with Lorna Gray and Trevira Boatright

Gray next contends that his communications with Lorna Gray and Trevira Boatright on the iPhone do not indicate their participation in the fraud. That is so, he argues, because Gray there did not "mention" "paying either of them out of the funds for some illicit, non-reimbursement-related purpose." Gray Br. at 7, 11.

That argument also fails. Gray was not charged with a conspiracy offense, and the Government did not allege that Lorna Gray or Boatright were knowingly complicit in Gray's fraud upon Pizziconi. The evidence at trial instead was tightly focused on Gray's dealings with Pizziconi. That Lorna Gray and Boatright, as persons close to Gray, benefited secondarily from the fraud did not imply their knowing complicity in it. And that certain communications with them did not reveal their complicity does not undermine the overwhelming evidence of Gray's guilt.

### 6.    October 28, 2020 Text Message Thread with Pizziconi

Gray, finally, cites an October 28, 2020 text message thread between Pizziconi and Gray in which they discuss potential financing alternatives for Pizziconi's purchase of the apartment. Gray Br. at 7.   Citing Pizziconi's statement that she could face a "massive problem" because she had "signed affidavits that said [she was] liquid and can close in cash," Gov't Br. Ex. 4 at 3, Gray argues that this document shows that "she misrepresented on an affirmation" and such could have been used to impeach Pizziconi's credibility on cross-examination, Gray Br. at 7.

That is wrong, because Gray selectively presents the text message.   Pizziconi states that she had "never misrepresented [her]self in a document before in [her] life" and identifies the reason she had this "problem":   as of the time she signed the affidavits, she "had no idea [she] should worry" about having the necessary funding in place.   *Id.* at 4.   The text messages thus do not support a knowing falsehood by Pizziconi, so much as that they reflect that Gray's misrepresentations to Pizziconi misled her to make inaccurate representations.   These included that the PPE deals had a "cash-to-cash" cycle of 90 days and that Gray would be able to arrange financing for her for the purchase of the apartment or a personal loan.   GXs 216, 217; *see also, e.g.*, GX 2006, 601.   Read in context, Pizziconi's text messages do not undermine her testimony, which, in any event, was overwhelmingly corroborated by her contemporaneous written communications with Gray.   *See, e.g.*, *United States v. Landau*, 155 F.3d 93, 105 (2d Cir. 1998) ("[W]here the resolution of the issues depended on assessment of the credibility of the witnesses, it is proper for the court to refrain from setting aside the verdict and granting a new trial."); *see also James*, 712 F.3d at 107.

Gray's claim is no better considering the four "nuggets" in combination.   None of these was consequential; together, they remain inconsequential; and, weighing these against the vast

and varied proof of Gray's guilt, the Court can say with assurance that these, if put before the jury, would not and could not have altered its verdict.

At bottom, having supervised the trial and closely evaluated the evidence, the Court is not left with any "concern that an innocent person may have been convicted." *Sanchez*, 969 F.2d at 1414; *United States v. Landesman*, 17 F.4th 298, 330 (2d Cir. 2021). Gray's motion does not come close to showing that sustaining the jury's verdict would constitute a manifest injustice.

## CONCLUSION

For the foregoing reasons, the Court denies Gray's motion for a new trial. The Clerk of Court is respectfully directed to close the motion pending at Docket 168.

SO ORDERED.

*Paul A. Engelmayer*

Paul A. Engelmayer
United States District Judge

Dated: October 30, 2024
       New York, New York